ams

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| CECILE DENISE COLEMAN, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | **Case No. 05-4149-JAR** |
| | ) | |
| BLUE CROSS BLUE SHIELD OF KANSAS, | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## MEMORANDUM AND ORDER

Plaintiff Denise Coleman filed this action against her former employer, Blue Cross Blue Shield of Kansas ("Blue Cross"), asserting that she was unlawfully terminated from her position as a data capture employee on August 17, 2004. Plaintiff alleges the following claims for relief: (1) interference under the Family Medical Leave Act ("FMLA"); (2) retaliation under the FMLA; (3) intentional discrimination under the Americans with Disabilities Act ("ADA"); (4) retaliation under the ADA; and (5) worker's compensation retaliation under Kansas law. The Court now considers defendant's Motion for Summary Judgment (Doc. 58), defendant's Motion to Strike Plaintiff's Response to Defendant's Motion for Summary Judgment (Doc. 72), and plaintiff's Motion to Amend/Correct Memorandum in Opposition to Motion (Doc. 79). The motions are fully briefed and the Court is prepared to rule. As explained more fully below, the Court denies defendant's motion to strike the response, denies plaintiff's motion to amend the response, and grants defendant's motion for summary judgment.

## I.  Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[1]  A fact is only material under this standard if a dispute over it would affect the outcome of the suit.[2]  An issue is only genuine if it "is such that a reasonable jury could return a verdict for the nonmoving party."[3]  The inquiry essentially determines if there is a need for trial, or whether the evidence "is so one-sided that one party must prevail as a matter of law."[4]

The moving party bears the initial burden of providing the court with the basis for the motion and identifying those portions of the record that show the absence of a genuine issue of material fact.[5]  "A movant that will not bear the burden of persuasion at trial need not negate the nonmovant's claim."[6]  The burden may be met by showing that there is no evidence to support the nonmoving party's case.[7]  If this initial burden is met, the nonmovant must then "go beyond the pleadings and 'set forth specific facts' that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[8]  When examining the underlying facts of the case, the Court is cognizant that all inferences must be viewed in the light most favorable to the nonmoving party and that it may not make credibility determinations or

---

[1]Fed. R. Civ. P. 56(c).

[2]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[3]*Id.*

[4]*Id.* at 251–52.

[5]*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[6]*Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp.*, 477 U.S. at 325).

[7]*Id.*

[8]*Id.*

weigh the evidence.[9]

When deciding a summary judgment motion, the Court may consider evidence submitted even if it would not be admissible at trial.  The Tenth Circuit recently explained,

> Parties may, for example, submit affidavits in support of summary judgment, despite the fact that affidavits are often inadmissible at trial as hearsay, on the theory that the evidence may ultimately be presented at trial in an admissible form.  Nonetheless, "the content or substance of the evidence must be admissible."  Thus, for example, at summary judgment courts should disregard inadmissible hearsay statements contained in affidavits, as those statements could not be presented at trial in any form.  The requirement that the substance of the evidence must be admissible is not only explicit in Rule 56, which provides that "[s]upporting and opposing affidavits shall . . . set forth such facts as would be admissible in evidence," Fed. R. Civ. P. 56(e), but also implicit in the court's role at the summary judgment stage.  To determine whether genuine issues of material fact make a jury trial necessary, a court necessarily may consider only the evidence that would be available to the jury.[10]

## II.  Motion to Strike and Motion to Amend/Correct Response Memorandum

On February 12, 2007, after obtaining three extensions of time from the Court, plaintiff filed her memorandum in opposition to summary judgment (Doc. 71) (hereinafter "response").  The third section of the response is entitled "Plaintiff's Response to Defendant's Alleged Statement of Facts" and spans about nineteen pages.  While it includes numbered paragraphs which correlate to defendant's statement of facts, only three of the ninety-one paragraphs provide a citation to the summary judgment record for support.[11]   The argument and authorities

---

[9]*Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

[10]*Argo v. Blue Cross Blue Shield*, 452 F.3d 1193, 1199 (10th Cir. 2006)  (quoting *Thomas v. Int'l Bus. Machs.*, 48 F.3d 478, 485 (10th Cir. 1995); Fed. R. Civ. P. 56(e)) (citations omitted).

[11](*See* Doc. 71 at 13 ¶ 57 , 16 ¶ 68, 18 ¶ 77.)

section of the response, spanning about forty-two pages, includes a review of evidence that is not cited nor discussed in the response to defendant's statement of facts.

The day after plaintiff responded to defendant's motion for summary judgment, defendant filed a motion to strike the response (Doc. 72).  The basis for the motion is that the response exceeds the page limitation set forth in D. Kan. R. 7.1, the April 16, 2006 Scheduling Order, and the Pretrial Order.  Furthermore, the reply memorandum argues that plaintiff's response to defendant's statement of facts is deficient under applicable rules, and thus, the facts as stated in defendant's memorandum in support of summary judgment should be deemed admitted.   Specifically, defendant complains that: (1) plaintiff's counsel's responses to the statement of facts do not contain citations to the record for support; and (2) much of the response relies upon plaintiff's own affidavit which contains primarily inadmissible evidence, or in some areas constitutes a "sham affidavit" because it contradicts her deposition testimony.  The Court will address defendant's arguments concerning plaintiff's affidavit in the next section of this memorandum and order.

Plaintiff's counsel does not deny that he exceeded the page limit for his brief by twelve pages.  Nor does plaintiff's counsel deny that he has ignored the rules applicable to memoranda in response to summary judgment motions as set forth in Fed. R. Civ. P. 56 and D. Kan. R. 56.1. Instead, counsel urges the Court that these deficiencies have caused no prejudice to defendant and should not only be excused, but that he should get a "second bite at the apple" by amending his response eleven weeks after the original response was filed and over six weeks after the reply was filed.  The Court cannot countenance such a result.

The Court declines to quote extensively for counsel the rules that govern summary

judgment practice not only in this Court, but in all federal courts.[12]  The Court has done so in the past with this counsel to no avail.[13]  Counsel for plaintiff is not unfamiliar with these rules, nor is he new to the practice of law in this Court.  While the Court appreciates counsel's apologies, it is his very experience with this Court and this federal district that makes many of his arguments concerning his failure to adhere to the rules disingenuous.

For example, in the response to defendant's motion to strike, counsel argues that he should, after the fact, be granted leave to exceed the page limit.  He contends that this is because both parties have conceded that the issues in this case are lengthy and complex, making them difficult to address within the thirty-page limit set forth in the local rules.  The Court fails to see the difficulty for counsel in seeking prior leave of Court to exceed the page limit on such grounds.  Instead, counsel asks the Court to either *post hoc* allow him leave to exceed the page limit, or to somehow allow him to "remove factual statements from the arguments and authorities section and include them as an exhibit."[14]  The technical deficiencies in the summary judgment response identified by defendant are inextricably intertwined.  Had counsel simply followed the rules applicable to summary judgment motion practice, such a result would be unnecessary.  Certainly if the statements to which counsel refers are truly arguments, they are inappropriate for an exhibit.[15]  And if they are instead factual statements, they should have been

---

[12]*See* Fed. R. Civ. P. 56; D. Kan. R. 56.1; (Pretrial Order, Doc. 53 at 40.)

[13]*See Satterlee v. Allen Press, Inc.*, 455 F. Supp. 2d 1236 (D. Kan. 2006); *Ney v. City of Hoisington, Kan.*, No. 05-4059-JAR, 2007 WL 608263 (D. Kan. Feb. 22, 2007); *Rojo v. IBP, Inc.*, No. 02-4112-JAR, 2007 WL 593637 (D. Kan. Feb. 21, 2007).

[14](Doc. 73 at 3–4.)

[15]As explained in the next section, simply converting them into an exhibit would not cure the problems with the factual averments in the response.

included in the response to defendant's statement of facts, or in plaintiff's additional statement of facts.  Such statements would not count toward the thirty-page limit.

Counsel further argues that defendant has not suffered prejudice as a result of these admitted deficiencies.  In terms of exceeding the page limit, counsel maintains that "[t]he 12 pages of verbatim testimony can be just as much part of plaintiff's answer outside the section regarding arguments.  In fact, defendant's attachments to its motion have several hundreds of pages more than plaintiff's attachments."[16]  Again, such an argument is a disingenuous attempt by counsel to somehow justify blatant disregard for the rules of practice and procedure.  First, the obvious reason behind the rule requiring specific citation to the record is so the Court is not required to conduct a fishing expedition of the record.  By specifically citing to the record, the Court can immediately refer with particularity to the evidence claimed to support a particular point.  So long as such references are available to the Court, the volume of evidence is irrelevant.  Given that these verbatim quotations are not included, even by reference, in plaintiff's response to the statement of uncontroverted facts, the Court does not see how these would create a genuine issue of material fact, regardless of the page limitation issue.

Counsel also suggests that he is somehow entitled to a greater page limit for the response since defendant is entitled a reply brief.  But it is elementary in this district that the moving party on any civil motion is entitled a reply brief.[17]  The rules take into account the burden on any moving party; in particular, on a party moving for summary judgment, where the facts are

---

[16](Doc. 73 at 4.)

[17]*See* D. Kan. R. 7.1(a) and (c) (providing for a motion, a response, and a reply). A sur-reply may be permitted to be filed in the rare case when "a movant improperly raises new arguments in a reply."  *See, e.g.*, *King v. Knoll*, 399 F. Supp. 2d 1169, 1174 (D. Kan. 2005) (quotations omitted).

viewed in the light most favorable to the non-moving party.[18]  While the Court declines to strike the entire response brief as a sanction for violating this rule, as described below, it will not become plaintiff's advocate by cross-referencing and incorporating all of the factual references in the argument and authorities section of the brief to the response to defendant's statement of facts section.

In his motion to amend his response, counsel again argues that granting his motion would not cause defendant prejudice.  He claims that the motion "is submitted in further efforts by plaintiff to attempt to simplify the Court's review of this matter."  While plaintiff's motion is rare, it is essentially a request to file out of time, which requires a showing of excusable neglect.[19]  Excusable neglect is a somewhat elastic concept and is not limited strictly to omissions caused by circumstances beyond the control of the movant.[20]  The determination of whether excusable neglect has been established is at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission including: (1) the danger of prejudice; (2) the length of the delay and its potential impact on judicial proceedings; (3) the reasons for the delay which includes whether it was within the reasonable control of the party seeking to show excusable neglect; and (4) whether that party acted in good faith.[21]

The delay in filing this motion alone belies the notion that the original deficiencies in the response were due to excusable neglect.  The motion for leave to amend was filed on May 2,

---

[18]*See supra* Part I.

[19]*See* Fed. R. Civ. P. 6(b)(2); D. Kan. R. 6.1(a).

[20]*Pioneer Inv. Servs. Co. v. Brunswick Assocs. L.P.*, 507 U.S. 380, 391–92 (1993).

[21]*Id.* at 395; *see also Bishop v. Corsentino*, 371 F.3d 1203, 1206–07 (10th Cir. 2004); *City of Chanute v. Williams Natural Gas*, 31 F.3d 1041, 1046 (10th Cir. 1994).

2007, just short of one month before this case was set for trial and about six weeks after the defendant filed an eighty-nine page reply brief.  Not only would allowing the amendment interfere with the Court's consideration of this motion, which began prior to the filing of the motion for leave to amend, but it would also require the Court to provide defendant with an opportunity to reply again.  Such a result would cause delay that would substantially impact the judicial proceedings.  Further, counsel has not proffered anything that would convince this Court that his failure to file the proposed amended response in the first instance was outside of his control.  Counsel provides this Court with no explanation as to why he was unable adhere to the rules when he initially filed his response brief, nor why he did not see fit to request leave to file a sur-reply.[22]

The danger of prejudice in granting this motion is likewise great.  As noted, granting the motion would require providing defendant with an opportunity to reply again.  But defendant has already spent considerable time preparing the original reply brief, much of which deals with the technical deficiencies in the response.  To require defendant to rework a reply based on a new response is patently unfair.  Plaintiff may not enjoy the benefit of reviewing defendant's reply brief for six weeks while the motion goes under advisement only to rework his brief at the eleventh hour.

Furthermore, the Court has reviewed plaintiff's proposed amended response brief and does not find that it would substantially aid in the Court's resolution of the motion for summary

---

[22]*See Ryan v. Shawnee Mission Unified Sch. Dist. No. 512*, 437 F. Supp. 2d 1233, 1235–37 (D. Kan. 2006) (granting plaintiff leave to file a sur-reply brief to respond to defendant's reply that made a number of evidentiary objections to plaintiff's summary judgment evidence).

judgment, nor does it rectify all of the deficiencies cited by defendant in its filings.[23]  While purporting to amend his response to comply with the rules, the amended response notably exceeds the thirty-page limitation found in D. Kan. R. 7.1.  With regard to the responses to defendant's statement of facts, counsel essentially amended the response by adding citations to specific paragraphs of plaintiff's affidavit.  While this is an improvement over the complete lack of citation in the original response, it still begs the other evidentiary objections to plaintiff's affidavit raised in defendant's reply brief.  As the Court will address more fully in the next section, the Court agrees with defendant that many statements in this affidavit are inadmissible because they are either conclusory, not based on personal knowledge, or are hearsay.  Specific citations to this affidavit do not change the Court's analysis on that issue.

In sum, the Court finds no possible excusable neglect that could justify granting plaintiff's counsel's motion for leave to amend his response.  While counsel repeatedly assures the Court that this motion is filed in an attempt to aid in the Court's deliberation of the summary judgment motion, it has in fact caused the opposite result.  The fact that counsel has repeatedly disregarded the rules of practice in this Court and in this district also supports an inference that such mistakes are not made in good faith.  In just the last year, this Court has admonished

---

[23]The Court takes this opportunity to urge counsel once again to review the local rules pertaining to responses to summary judgment motions.  D. Kan. R. 56.1.  In addition to failing to cite to the record with particularity, the Court encourages counsel to further review the purpose and meaning of controverting facts.  To controvert, or dispute, a factual contention is to state that such a statement is not supported by the document cited in support of that statement.  As such, it would be appropriate to claim that a given statement is controverted with a citation to the record that disputes the proposition.  For example, paragraph 5 of defendant's statement of facts states the accuracy requirements for data capture employees and the company's policy for disciplining employees who fail to meet those requirements.  Plaintiff purports to controvert this statement by arguing that an injury or illness would prevent an employee from meeting the standard and that the requirements are an arbitrary goal.  This statement does not controvert the fact stated and supported by evidence paragraph 5 of defendant's statement of facts.  Plaintiff's response is replete with examples such as this.  The Court emphasizes to counsel that this practice makes the Court's review and deliberation of summary judgment motions difficult and lengthy and defeats the purpose of the summary judgment process: to allow the Court to determine whether there is truly a genuine issue of material fact that requires a trial.

9

counsel multiple times for failing to follow elementary rules of summary judgment practice.[24]

The Court declines to simply admonish counsel in this case and instead denies his motion.  The

Court will consider plaintiff's original response brief but declines to search the record for

evidentiary support for her contentions.  As described fully in the next section, to the extent that

defendant's statement of facts are supported by the record, they are largely deemed admitted due

to plaintiff's failure to properly support her contentions in the original response that disputed

facts exist that defeat defendant's motion for summary judgment.

## III. Uncontroverted Facts

### A. Evidentiary Issues

Before addressing defendant's statement of facts in paragraph format, plaintiff

prefaces: "All responses to defendant's alleged statement of facts were provided by Ms.

Coleman under oath as indicated in the attached affidavit."  Plaintiff's affidavit is fifteen pages

in length and spans ninety-four paragraphs.  At the beginning of the affidavit, plaintiff states that

she has "reviewed defendant's motion for summary judgment and its 93 statements of alleged

facts."[25]  Defendant objects to plaintiff's method of incorporating her own affidavit into the

response to defendant's statement of uncontroverted facts.  Defendant further objects that much

---

[24]*See Satterlee v. Allen Press, Inc.*, 455 F. Supp. 2d 1236 (D. Kan. 2006) (providing an extensive analysis of excusable neglect in counsel's failure to attach any supporting documents to the plaintiff's response to a motion for summary judgment and documenting his extensive history with this court); *Ney v. City of Hoisington, Kan.*, No. 05-4059-JAR, 2007 WL 608263 (D. Kan. Feb. 22, 2007) (admonishing counsel for failure to properly respond to defendant's statement of facts set forth in its summary judgment motion); *Rojo v. IBP, Inc.*, No. 02-4112-JAR, 2007 WL 593637 (D. Kan. Feb. 21, 2007) (same).  Other courts have also struggled with counsel's failure to adhere to the rules of summary judgment practice.  *See, e.g., Boldridge v. Tyson Foods, Inc.*, No. 05-4055-SAC, 2007 WL 1299197 (D. Kan. May 2, 2007) (denying motion for reconsideration of the denial of summary judgment, as plaintiff failed to submit admissible evidence initially, or upon reconsideration, to defeat summary judgment).  As the Tenth Circuit has explained to counsel: "the district court [ ] should not be cast in the role of stage director of the litigation drama—forced to prod the actors through rehearsals until the proper performance is achieved."  *Bui v. IBP, Inc.*, 34 Fed. App'x 653, 656 (10th Cir. 2002).

[25](Doc. 71, Coleman Aff. ¶ 2.)

of plaintiff's affidavit is inadmissible because it is either not based on personal knowledge, is conclusory, or hearsay.

As this Court has explained to counsel in the past, the Tenth Circuit has held that merely placing evidence in the record on summary judgment without pointing the Court to it is insufficient: "it is the responding party's burden to ensure that the factual dispute is portrayed with particularity, without . . . depending on the trial court to conduct it's own search of the record."[26]  This is precisely what plaintiff's counsel expects of this Court by placing limited references to other portions of the record in its arguments and authorities section but not in its response to defendant's statement of facts, or any additional statement of fact.  This Court declines to conduct a fishing expedition of plaintiff's affidavit or any other record evidence in order to support the assertions made in her response.  In line with D. Kan. R. 56.1, the Court will deem admitted for the purpose of summary judgment all facts that are not controverted by a readily identifiable portion of the record.

Insofar as the affidavit is responsive to defendant's statements of fact, Fed. R. Evid. 602 requires that a testifying witness "ha[ve] personal knowledge of the matter" testified to.[27]  Also, Fed. R. Civ. P. 56(e) requires that affidavits be made on personal knowledge and "set forth such facts as would be admissible in evidence . . . .  The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits."  "Under the personal knowledge standard, an affidavit is inadmissible if 'the witness could not

---

[26]*Cross v. Home Depot*, 390 F.3d 1283, 1290 (10th Cir. 2004) (quoting *Downes v. Beach*, 587 F.2d 469, 472 (10th Cir. 1978)).

[27]Fed. R. Evid. 602.

have actually perceived or observed that which he testifies to.'"[28]   Statements of "mere belief in

an affidavit must be disregarded."[29]   There are multiple statements of mere belief in plaintiff's

affidavit that must be disregarded here, despite her assertion that all statements are based on her

personal knowledge.[30]   In other statements, there is no indication that plaintiff could have

actually perceived or observed that which she testified to.[31]   Some statements, such as plaintiff's

recollections of what her physicians told her, are simply inadmissible hearsay.[32]   These

statements may not be considered by the Court as they are inadmissible not just in form, but also

in substance.

Finally, defendant argues that many of the statements in plaintiff's affidavit contradict

prior statements in her deposition; therefore, it is a "sham affidavit."   The Court may not

disregard plaintiff's affidavit simply because it conflicts with plaintiff's prior sworn statements.[33]

But "such evidence may be disregarded when a court concludes that the evidence is merely an

attempt to create a sham fact issue."[34]   "[T]he utility of summary judgment as a procedure for

screening out sham fact issues would be greatly undermined if a party could create an issue of

fact merely by submitting [evidence] contradicting his own prior testimony."[35]   The Court looks

at the following factors to determine if plaintiff's affidavit presents a sham fact issue: "whether

---

[28]*Argo v. Blue Cross Blue Shield*, 452 F.3d 1193, 1200 (10th Cir. 2006).

[29]*Id.* (quoting *Tavery v. United States*, 32 F.3d 1423, 1427 n.4 (10th Cir. 1994)).

[30](Doc. 71, Coleman Aff. ¶¶ 26–29, 37–38, 45.)

[31]*Id.* ¶¶ 30, 47, 49, 58, 59, 83.

[32]*Id.* ¶¶ 17, 18, 19, 31, 32, 51, 64, 81.

[33]*Martinez v. Barnhart*, 177 Fed. App'x 796, 800 (10th Cir. 2006).

[34]*Id.* (citing *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986)).

[35]*Franks*, 796 F.2d at 1237.

the [party] was cross-examined during his earlier testimony, whether the [party] had access to pertinent evidence at the time of his earlier testimony, or whether the [contested evidence] was based on newly discovered evidence, and whether the earlier testimony reflects confusion which the [contested evidence] attempts to explain."[36]  Plaintiff was cross-examined during her deposition and there is no evidence that she was without pertinent evidence at the time of her earlier testimony, or that the affidavit is based on newly discovered evidence.  Likewise, the affidavit does not reflect that plaintiff was confused during her deposition to the extent she was required to explain the confusion in a later affidavit.  To the extent plaintiff contradicts her prior sworn testimony, the Court will disregard her statements.

In accordance with Rule 56, defendant has properly supported its motion for summary judgment with affidavits, deposition testimony, and other admissible evidence.  In response, defendant has failed to controvert the facts asserted in defendant's motion.  As such, the Court considers only whether defendant is entitled to summary judgment as a matter of law, based on the undisputed facts set forth in its motion.

### B.  Undisputed Facts

The following facts are either uncontroverted, stipulated to, or viewed in the light most favorable to plaintiff.  Plaintiff Denise Coleman began working at defendant Blue Cross, an insurance company, on August 31, 1981.  At the time of her termination on August 17, 2004, and for several years prior, plaintiff held the position of data capture employee.  Plaintiff's immediate supervisor was Jennifer Berroth and her manager was Brad Moser.

The position of data capture employee is essentially a data entry position for insurance claims filed by health care providers.  The data capture employee reads from an electronic image

---

[36]*Id.*

of the claim form and keys into a computer database the claim information: identification

number, patient name, and type of service provided.  Defendant receives thousands of these

claims each day.  An error in entering the claim information impacts the processing of the claim

and the payment of the claim.  Defendant requires the data capture employees to enter 286

claims during a daily shift, which works out to an average of one claim every 1.65 minutes,

accounting for break time, at an accuracy rate of 97%.  The supervisors of each department

receive daily reports on each data capture employee's accuracy and speed.  If a data capture

employee is unable to meet the performance standards set by defendant, a progressive discipline

system is in place which includes counseling, written warnings, and eventual termination.

### *FMLA Requests*

Between 1997 and 2004, plaintiff filed numerous requests for FMLA leave for a myriad

of health problems.  Throughout this time period, plaintiff requested leave for the following

maladies: back pain, hypertension, headaches, depression and anxiety, gastrointestinal problems,

uterine problems, a change in bowel habits, dyspepsia, back pain, abnormal female genital pain,

stress, asthma, muscle spasms, bronchitis, pneumonia, sarcoidosis, and diabetes.  Defendant

approved plaintiff's FMLA leave requests on all but two occasions.  First, plaintiff requested

leave for a muscle spasm on March 5, 2001;[37] and she requested leave for the period of March 5,

2001 through March 4, 2002 on a full-time and intermittent basis.  Defendant denied this request

because there was no health care provider certification indicating that plaintiff was suffering

from a "serious health condition."  The certification form was filled out by plaintiff's

chiropractor, Dr. Penn.  When asked to state the nature of plaintiff's incapacity, he indicated

"NA."  Dr. Penn stated that plaintiff would need to be absent from work on an intermittent basis

---

[37](Ex. 18.)

in order to attend ten to fifteen appointments.  When asked to check the applicable category (ies) of the patient's condition, Dr. Penn marked "none of the above."  Based on this certification, defendant denied plaintiff's request for leave.

Second, plaintiff requested FMLA leave for bronchitis and back pain on May 24, 2001. Plaintiff requested leave for the period ending on May 3, 2002 on a full-time basis.  Along with her request, plaintiff included a note from her physician, Dr. Atwood, stating that she should be relieved from work on May 23 through May 24, 2001 due to illness.  On the certification form, Dr. Atwood wrote that plaintiff would be required to be off of work through May 25, 2001 due to acute bronchitis.  Defendant denied the request "based on information provided by Dr.'s office condition is not considered a serious health condition."

On March 26, 2003, plaintiff requested and was approved for FMLA leave because she was scheduled to have a hysterectomy on March 31, 2003.  But just prior to the surgery, plaintiff contracted pneumonia, so the surgery was postponed until September 18, 2003.  Defendant's records indicate that a new leave request was submitted for the September surgery, which was approved.

On July 28, 2003, plaintiff requested leave for the period of July 11, 2003 through December 31, 2003 on a full-time basis for sarcoidosis and stress.  Dr. Moss filled out a certification form, indicating that plaintiff required occasional office visits but that she was not incapacitated.  Dr. Moss also indicated that it was not necessary for plaintiff to work on less than a full schedule.  The leave request was approved for intermittent leave for two hours at a time for the period of July 11, 2003 through September 11, 2003.

On August 3, 2004, plaintiff requested FMLA leave from July 28, 2004 through December 2004 on a full-time basis.  Plaintiff stated that she required leave due to her

sarcoidosis, a heart problem, high blood pressure, diabetes, stress, depression and a stomach problem.  She stated that she was having a surgical procedure on July 28, 2004.  Dr. Thomas Welton filled out a certification indicating that plaintiff suffered from nonucler dyspepsia and would need intermittent periods off work for doctor's appointments.  Plaintiff's social worker, Bernard Nobo, submitted a certification form on August 4, 2004 stating that plaintiff suffered from depression and would need intermittent periods off work for appointments.  On August 12, 2004, Dr. Moss submitted a certification form stating that plaintiff was treated on July 27, 2004 for lab work and on August 4, 2004 for a sleep study.  He indicated plaintiff would be rechecked in one month and after that, four months, and then every six months.  Plaintiff's August 3, 2004 FMLA request was approved on August 10, 2004 for intermittent leave in order to attend doctor's appointments from July 28, 2004 through October 28, 2004.  Plaintiff did not produce a certification form for the surgery she referenced on the August 3, 2004 leave request.

### Workers' Compensation Claims

When defendant receives a report of a work-related injury, the Corporate Health Services department forwards the claim to Thomas McGee, L.C. ("Thomas McGee"), defendant's outside third-party administrator.  Thomas McGee coordinates the employee's care, determines compensability and authorizes medical treatment.  While a workers' compensation claim is pending, the Corporate Health Services department is responsible for making sure that the employee receives medical care, and facilitates communication between the employee, the medical providers, and Thomas McGee.  The department is also responsible for addressing any work site issues that arise.  If an injured employee retains an attorney to handle their workers' compensation claim, Thomas McGee's insurance adjuster will not communicate with the employee directly, but instead communicates with the employee's attorney and defendant's

attorney.

Plaintiff filed two workers' compensation claims during her tenure at Blue Cross.  First, on May 20, 1999, plaintiff submitted a report of accident, stating that she had been injured on October 3, 1997.  Plaintiff reported that her back, neck and hand hurt and her fingers were swelling when she was keyboarding.  Corporate nursing notes indicate that plaintiff was diagnosed with right arm sprain by Dr. Geis, after multiple visits, and that she was advised to use splints, and take Daypro.  Thomas McGee closed this claim on July 28, 1999.  But plaintiff continued to see Dr. Geis through February 27, 2001 on a regular basis, and he prescribed her medication for the pain in her arms and back.

Plaintiff's second report of accident was submitted on November 21, 2002, citing pain in her right arm while keying claims on November 18, 2002.  According to the corporate nursing notes, plaintiff was immediately counseled to follow conservative treatment measures including ice, rest, and trimming her fingernails.  In response to this injury, plaintiff began treatment at Occupational Health Services of America ("OSHA") in December 2002 that continued through March 16, 2004.  She was treated with medication, physical therapy, splinting, and modified work duty.

### Work Restrictions

Physicians at OSHA imposed a number of work-related restrictions on plaintiff during her treatment there.  These restrictions included: having a work station evaluation; varying her tasks; wearing a splint when at home; resting for ten minutes per hour; wearing a compression sleeve and wrist splint while working; stopping the use of wrist and elbow splints; doing stretching exercises for five minutes every hour; keying with the left hand while wearing a compression sleeve and wrist splint; alternating using the left and right hands for keying; and

ultimately, using the left hand only.  Plaintiff was also evaluated by Dr. John Moore on December 9, 2003, who concluded that plaintiff had "mild variant of radial tunnel syndrome" and recommended plaintiff use a compression sleeve, anti-inflammatory medication, do stretching exercises for five minutes every hour, and learn to key with her left-hand.[38]

While plaintiff's workers' compensation claims were pending, the employees in the Corporate Health Services department conducted approximately six evaluations of plaintiff's work station.  Plaintiff was provided with special equipment such as an adjustable footrest, a gel wave palm rest, a new chair, a new keyboard, and wrist splints.  Because the Corporate Health Services department could not ascertain any other adjustments for plaintiff's work station that would be helpful when plaintiff requested more evaluations, Terri Janda, the Administrator of Corporate Health Services, hired Kansas Rehabilitation Hospital ("KRH") to come and assess the work station.  The KRH recommendations primarily involved adjustments to plaintiff's existing work stations such as lowering the arms and raising the height on her chair.  Each recommendation made by KRH was implemented.

On February 6, 2004, plaintiff's occupational therapist recommended a special ergonomic keyboard that included a left-hand keypad.  Plaintiff had selected a specific keyboard out of a catalog.  Janda contacted the occupational therapist and informed her that the company's usual policy was for a physician to submit a request to the company for any special equipment.  Defendant then orders, provides, or modifies computer equipment through its information center.  Because defendant had provided plaintiff with an ergonomic keyboard approximately one year prior to this request, Janda contacted plaintiff's treating physician, Dr. Curtis, and asked if it

---

[38](Doc. 63, Ex. 35.)  This document is a letter to Dr. Lynn Curtis regarding Dr. Moore's examination of plaintiff.  While he recommends some treatment options for plaintiff's radial tunnel syndrome, Dr. Moore does not mention any work restrictions for plaintiff.

would suffice to provide a detachable left-hand ten-keypad to the ergonomic keyboard that plaintiff was already using.  Dr. Curtis agreed and the keypad was received by plaintiff within approximately fifteen days of her request.  Defendant viewed plaintiff as subject to work restrictions until at least March 16, 2004.[39]

On April 26, 2004, Thomas McGee contacted and provided plaintiff's medical records to Dr. Hendler, asking him to examine plaintiff.  Plaintiff advised Dr. Hendler that she was keying with her left hand, as had been recommended.  Dr. Hendler believed that plaintiff suffered from a repetitive strain of her upper extremities and scheduled an electrodiagnostic study to learn more about her condition and prescribed her anti-inflammatory medication.  He continued her on a modified work duty that had been prescribed by Dr. Curtis at OHSA.  After evaluating the test results from the electrodiagnostic study that had been conducted on May 6, 2004, Dr. Hendler confirmed his diagnosis that plaintiff suffered from repetitive strain of her upper extremities and that further therapy was unlikely to be helpful.

On May 27, 2004, plaintiff was treated by Dr. Hendler and told him that the medications he had prescribed were not helping.  Dr. Hendler changed plaintiff's prescriptions to include a muscle relaxer and continued her on a modified work duty.  Dr. Hendler explained to plaintiff that the purpose of her being on modified work duty was to allow time to get her symptoms under better control so that she could eventually return to regular duty.  On June 10, 2004, plaintiff was examined by Dr. Hendler and complained of severe pain and a patchy loss of sensation over parts of her hands and arms.  Dr. Hendler again changed her medication, but noted that the distribution of her abnormality was nonphysiologic.  Dr. Hendler explained to plaintiff that the decision to continue working despite her symptoms is a personal choice and not

_____

[39](Doc. 71, Ex. D.)

a medical issue.

Plaintiff was examined by Dr. Hendler again on June 17, 2004 and reported that none of the medication she had been prescribed by him or other physicians were helpful. Dr. Hendler again noted nonphysiologic symptoms and concluded that plaintiff was unable to improve with further treatment—she was at maximum medical improvement. He stated that "[t]here are no identified work restrictions at this time although she certainly has a preference for less repetitive work." Accordingly, Dr. Hendler submitted a Work Status Report on June 17, 2004 allowing plaintiff to return to regular duty. Dr. Hendler noted after an appointment with plaintiff on June 22, 2004 that no further visits would be required because plaintiff's pain was being treated solely with over-the-counter medication.

### Plaintiff's Work Performance

During the time plaintiff was subject to work restrictions ordered by her physicians, defendant allowed her to process fewer claims than the normal requirement of one every 1.65 minutes. Plaintiff was told that although she could process a lower number of claims, she was still expected to achieve 97% accuracy on those claims she was able to process. Once plaintiff was restored by Dr. Hendler to regular work duty, her superiors at Blue Cross began to assess her performance according to the normal performance criteria applicable to all other data capture employees.

On April 26, 2004, a note was purportedly made by human resources personnel that Brad Moser had called them regarding plaintiff's accuracy percentages.[40] Before plaintiff had left on FMLA approved leave from April 1 through April 16, 2004, her accuracy was 91-92%. The note indicates that Moser wanted to give plaintiff an unsatisfactory review that had already been

---

[40]It is unclear who actually authored this note, as it is not authenticated.

written up before she left on her FMLA leave and then give her a final unsatisfactory review when she returned, explaining that if she does not meet the accuracy goal next time, she will be fired.  The note states that Moser was advised to "just start Denise on a fresh quarter as of April 1, 2004 (based on the time she is here) and proceed as he does for all employees."

On July 19, 2004, defendant notified plaintiff in writing that her performance for the week ending July 16, 2004 had been unsatisfactory, as she was taking an average of four minutes to complete each claim form.  On July 26, 2004, defendant again notified plaintiff in writing that her performance for the week ending July 23, 2004 was unsatisfactory, as she was taking an average of 3.94 minutes per claim.  This notice informed plaintiff that "termination will result on next unsatisfactory occurrence of production.  The acceptable rating is 1.65."[41]  On August 17, 2004, plaintiff received another unsatisfactory report for the weeks ending August 6 and August 13, 2004.  Her production had been 4.37 and 3.27 minutes, respectively, per claim.  She was also told that for the week ending August 6, 2004, her accuracy rating was 88.24%.  At this time she was notified that she was being terminated for failure to meet production and accuracy job performance standards.

### Other Jobs

Prior to plaintiff's termination, on August 12, 2004, defendant offered plaintiff a position as a correspondence specialist.  Tonya Fuller, who would be plaintiff's supervisor in this new position, did a walk-through with plaintiff, and discussed the requirements of the job.  Plaintiff told Fuller that she could not do the lifting associated with the new position.  Fuller replied that they would work with plaintiff regarding any restrictions that her doctors imposed.  Fuller also told plaintiff that she could alternate duties in order to avoid extended periods of data entry.

---

[41](Doc. 64, Ex. 50.)

Fuller told plaintiff that the correspondence specialist position would provide the same hourly wage and benefits.  On August 16, 2004, plaintiff turned down the correspondence specialist job offer.

After plaintiff turned down the correspondence specialist position, the decision was made to terminate her.  The decision was made by a group of individuals: Berroth, Moser, Fuller, Robert Young, the Director of Human Resources, and Jane Chandler Holt, in-house counsel.  Ultimately, though, Young approved the decision to terminate plaintiff.[42]

On February 22, 2005, plaintiff applied for Social Security disability benefits.  She stated on her application form that she became completely unable to work on August 17, 2004, the date of her termination.  She claims to be disabled on the social security application due to both physical and mental conditions.  On May 16, 2005, plaintiff submitted an intake questionnaire to the EEOC.

## IV. Discussion

### A.  FMLA Claims

Under the FMLA, an eligible employee is entitled to a total of 12 workweeks of leave during any 12-month period "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee."[43]  Leave for a serious health condition may be taken intermittently or on a reduced leave schedule "when medically necessary. The taking of leave intermittently or on a reduced leave schedule . . . shall not result

---

[42]On August 17, 2004, defendant posted a job vacancy for a logistics technician in the Information Services and Claims division.  Essential job functions of that job included the ability to key 50% of the day as well as flexibility and the ability to bend and stoop as required for filing or other aspects of the job.  Plaintiff did not apply for the position.

[43]29 U.S.C. § 2612(a)(1)(D).

in a reduction in the total amount of leave to which the employee is entitled . . . beyond the amount of leave actually taken."[44]  Plaintiff asserts her FMLA claims under two theories of relief: (1) interference,[45] and (2) retaliation.[46]  Defendant urges that summary judgment is appropriate on both claims because they are either barred by the statute of limitations or due to a lack of genuine issue of material fact that could lead a reasonable jury to find in plaintiff's favor on the merits.

### 1.  Statute of Limitations

Actions for violations of the FMLA must be brought within two years of the alleged violation.[47]  In the case of a willful violation, the statute of limitations is three years.[48]  Plaintiff filed her Complaint on December 22, 2005.  The parties dispute what alleged violation should be considered for purposes of calculating the statute of limitations.  In its motion for summary judgment, defendant addresses what it believed to be plaintiff's FMLA claims.  On the interference claim, it addressed the two FMLA claims that were denied in 2001 and on the retaliation claim, it addressed plaintiff's contention that she was charged vacation time for FMLA leave in 2003 and 2004.  Plaintiff responds that her claims are based on her termination and on an April 26, 2004 note that allegedly indicates Moser wanted to interfere with plaintiff exercising her rights under the FMLA because he wanted to discipline her before and after her

---

[44]*Id.* § 2612(b)(1).

[45]§ 2615(a)(1).

[46]§ 2615(a)(2).

[47]§ 2617(c)(1).

[48]§ 2617(c)(2).

April 1–16, 2004 leave period for performance issues.[49]

Defendant maintains that plaintiff's allegations of interference and retaliation made in her response were not previously made in discovery or in the Pretrial Order.  The Pretrial Order "'measures the dimensions of the lawsuit,' and 'control[s] the subsequent course of the action unless modified by a subsequent order.'"[50] The Pretrial Order characterizes plaintiff's factual averments on the FMLA claims as follows:

> Plaintiff contends that during the three years preceding her firing, defendant denied her certain FMLA leave requests, sought to discourage her from taking FMLA leave in various forms including repeated requests for information and otherwise interfered with plaintiff's entitlement to FMLA leave.
> At the time that defendant fired Ms. Coleman, she was availing herself of the intermittent leave provisions of the FMLA.[51]

 The Court does not find that plaintiff's factual contentions in the response substantially deviate from these representations.

Defendant urges that the interference claims could only be based on the allegation that defendant wrongfully denied plaintiff's FMLA claims.  Because defendant only denied plaintiff's FMLA requests on two occasions, March 3, 2001 and May 25, 2001, defendant maintains that those claims are barred even under a three-year statute of limitations.  To the extent plaintiff relies on these allegations for her interference claim, defendant is correct.  But plaintiff points to an April 26, 2004 note about Moser's intent to write plaintiff up for her accuracy problems before and after she took FMLA leave in April 2004.  Defendant has pointed

---

[49](Doc. 71, Ex. A.)  While plaintiff refers to this document as a "memo," there is no "to" or "from" line and no indication who wrote it.

[50]*Shaub v. Newton Wall Co/UCAC*, 153 Fed. App'x 461, 464 (10th Cir. 2005) (quoting *Hullman v. Bd. of Trustees of Pratt Cmty. Coll.*, 950 F.2d 665, 668 (10th Cir. 1991); Fed. R. Civ. P. 16(e)).

[51](Doc. 53 at 8.)

to a lack of evidence to support the contention that Moser in fact disregarded the advice provided to him, as documented in the April 26, 2004 note, that he start plaintiff on a fresh quarter as of April 1, 2004.  There is no evidence of an unsatisfactory report filed in April.[52]  Nor is there evidence of Moser's sentiment actually interfering in plaintiff's use of FMLA leave.  Plaintiff asserts in her affidavit, without reference to any particular date, that Moser did discipline her and that he placed her in an unfair weekly review process, instead of the monthly review that applied to other employees.  The Court finds this insufficient to prove to a rational trier of fact that defendant interfered with plaintiff's exercise of her FMLA rights in April 2004.  While the Court finds that the interference claim is barred by the statute of limitations, the Court will nevertheless proceed to address the merits of the claim in the next section and finds that even if the claim is not barred by the statute of limitations, summary judgment is still appropriate.

Plaintiff argues her retaliation claim accrued when she was terminated in August 2004, well within the statute of limitations.  Defendant argues that there is no factual basis for such a claim.  The Court will address the merits of plaintiff's claim below, but for purposes of the statute of limitations, the Court finds that there exists a genuine issue of material fact about when the FMLA retaliation claim accrued.

### 2.  Interference

To assert a claim for interference, plaintiff has the burden to show entitlement to FMLA leave, but need not show the employer's intent to interfere with FMLA leave.[53]  Under the

---

[52]Plaintiff refers the Court to her affidavit at ¶¶ 71–72, where she asserts that Moser told her in March 2004 that if she made another error she was going to be fired and that he changed her quotas unfairly.  Even if Moser told plaintiff this information in March, this does not explain either the April email or the fact that plaintiff was not terminated in April, despite her performance or this meeting.

[53]See 29 U.S.C. § 2612(a)(1)(D).

interference theory, if an employer interferes with an employee's FMLA-created right to medical leave, it has violated the FMLA, regardless of its intent.[54]  In such a case, the employee must demonstrate her entitlement to the disputed leave.[55]   A *prima facie* case of interference requires a showing that:(1) plaintiff was entitled to FMLA leave; (2) that an adverse action by the employer interfered with plaintiff's right to take FMLA leave; and (3) that the employer's adverse action was related to the exercise or attempted exercise of plaintiff's FMLA rights.[56] Nonetheless, even when an employee requests and can demonstrate an entitlement to FMLA leave, she has no greater rights than the employee who continues to report to work.[57]  Thus, an employee may be terminated, even where the termination interferes with her ability to take FMLA leave, so long as she would have been terminated regardless of her leave request.[58]

Defendant concedes that plaintiff was entitled to FMLA leave, but argues that there is a lack of evidence to support that it acted adversely to interfere with plaintiff's exercise of her rights under the FMLA.  In the response, plaintiff contends that she was denied substantive rights under the FMLA in three ways: (1) defendant exhibited hostility toward her leave requests; (2) Moser was plotting to fire her based on borderline performance results; and (3) she was in the process of applying for intermittent leave under the FMLA when she was terminated.

The FMLA does not define "interference," but Department of Labor regulations provide that interference with the exercise of an employee's rights includes not only refusing to authorize

---

[54]*Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955, 960 (10th Cir. 2002).

[55]*Id.*

[56]*Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1180 (10th Cir. 2006).

[57]*See Gunnell v. Utah Valley State Coll.*, 152 F.3d 1253, 1262 (10th Cir. 1998).

[58]*See id.*

FMLA leave, but discouraging an employee from using such leave.[59]  If an employer provides a powerful disincentive for taking FMLA leave, it constitutes interference.[60]  In this case, defendant points to a lack of evidence that its conduct rose to the level of creating a "powerful disincentive" for taking FMLA leave in contrast to actions that have been prohibited by other courts.[61]

First, out of the multitude of FMLA requests made by plaintiff between 1997 and 2004, only two were ever denied by defendant.  Both of those requests were denied in 2001, more than three years before she was terminated or before plaintiff alleges any adverse action was taken against her.  In *McKinzie v. Sprint/United Management Co.*,[62] the court found that defendant had not interfered with plaintiff's FMLA rights when she was granted leave whenever she requested it.[63]  The plaintiff argued that interference was shown by her supervisors' sarcastic and derogatory comments about her need for leave, the requirement that she have her FMLA recertified, the requirement that plaintiff keep track of her work time after taking leave, and her supervisors' criticism of her work performance.[64]  The court rejected plaintiff's contention that these allegations showed interference when plaintiff was allowed to take FMLA leave, and there

---

[59]29 C.F.R. § 825.220(b).

[60]*Mardis v. Cent. Nat'l Bank & Trust of Enid*, 173 F.3d 864, 1999 WL 218903, at *2 (10th Cir. Apr. 15, 1999).

[61]*See, e.g.*, *id.* at *2 (finding interference when an employer informed an employee that she would be irrevocably deprived of all accrued sick leave and annual leave as a condition of taking FMLA leave); *Mondaine v. Am. Drug Stores, Inc.*, 408 F. Supp. 2d 1169, 1203 (D. Kan. 2006) (holding that employer's oral denial of plaintiff's request for FMLA leave showed interference); *Goodwin-Haulmark v. Menninger Clinic, Inc.*, 76 F. Supp. 2d 1235, 1242 (D. Kan. 1999) (holding that defendant interfered with plaintiff's right when the employer forced her to choose between resignation and working without leave).

[62]No. 03-2348-GTV, 2004 WL 2634444, at *10 (D. Kan. Nov. 16, 2004).

[63]*Id.*

[64]*Id.*

was nothing in the record showing that plaintiff was discouraged from taking FMLA leave, or that defendant's conduct created any kind of chilling effect.[65]

The facts in this case are highly similar.  Plaintiff was repeatedly granted FMLA leave, and given the numerous requests for leave prior to her termination that were granted, there is no evidence that any rude or sarcastic comment made by her superiors created a chilling effect.   In her deposition, plaintiff attributes the hostile comments to Berroth and surmised that they were based on age and race.  And the unauthenticated note plaintiff points to in support of her contention that Moser was "plotting to fire her" does not create a genuine issue of material fact given the lack of evidence that his attitude translated into any action by Blue Cross.  Plaintiff was not fired the next time she received an unsatisfactory report, but instead, received at least three more such reports prior to her termination.

Finally, there is no evidence that plaintiff's termination interfered with the intermittent leave she was in the process of requesting in August 2004.  The August 3, 2004 leave request for intermittent leave was approved.  Plaintiff asserts in her response that she requested a reduced work schedule so that she could learn to key with her left hand and that the denial of this request interfered with her rights under the FMLA.[66]  While plaintiff is correct that the FMLA covers intermittent leave as well as leave on a full-time basis, there is no evidence that plaintiff was denied intermittent leave under the FMLA.  Such a claim is distinct from any claim plaintiff may

---

[65]*Id.*  Plaintiff offers no evidence that plaintiff was given a powerful disincentive to take FMLA leave due to the alleged hostility by her superiors.

[66]Plaintiff also contends, without explanation, that she has presented evidence that she had FMLA leave time remaining when she was terminated.  The Court fails to see how this supports her claims.  Certainly, she does not purport to argue that any time an employee is terminated and has unused FMLA leave, there is an interference under the statute.  Such a contention is not supported by law.

have that defendant failed to reasonably accommodate her under the ADA.[67]  All of the intermittent leave requests in the record for 2004 were granted by defendant.  While plaintiff's argument may be relevant to the ADA claim, defendant points to a lack of evidence that such a request was denied under the FMLA.

Furthermore, defendant has come forward with sufficient evidence to show that plaintiff would have been terminated regardless of her FMLA requests in July and August 2004.[68]  Starting in July 2004, the month after she was released from work restrictions, plaintiff had been progressively disciplined for her failure to meet performance standards, both in quantity and accuracy of entering claims.  Plaintiff had been warned that failure to meet performance goals would result in termination.[69]  Plaintiff's termination for failing to meet objective criteria applicable to any other employee in her position belies the notion that plaintiff would not have been terminated absent her "request for or taking of FMLA leave."[70]  Defendant has pointed to a lack of evidence that it interfered with plaintiff's entitlement to FMLA leave.  Because plaintiff fails to point the Court to evidence that would create a genuine issue of material fact on the issue, summary judgment is appropriate.

### 3.  Retaliation

When analyzing FMLA retaliation claims under 29 U.S.C. § 2615(a)(2), the Court

---

[67]*See* 29 C.F.R. § 825.702 (explaining that "disability" under the ADA and "serious health condition" under the FMLA are different concepts and that while the FMLA allows for twelve weeks leave in any twelve-month period, the ADA allows for an indeterminate amount of leave as a reasonable accommodation).

[68]*Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1180 (10th Cir. 2006) (explaining that the burden is on the employer to demonstrate the employee would have been terminated regardless of the FMLA request); *Bones v. Honeywell, Int'l, Inc.*, 366 F.3d 869, 877–78 (10th Cir. 2004).

[69]*See Bones*, 366 F.3d at 878.

[70]*Metzler*, 464 F.3d. at 1181 n.10.

applies the *McDonnell-Douglas* burden-shifting scheme.[71]  Under that approach, a plaintiff's establishment of a *prima facie* case creates a presumption of retaliation.[72]  The burden then shifts to the defendant to produce evidence that the adverse employment action was taken for a legitimate, nondiscriminatory reason.[73]  If the defendant meets this burden, the burden shifts back to the plaintiff to present evidence that the proffered reason was not the true reason for the employment decision.[74]  In order to establish a *prima facie* case of FMLA retaliation, plaintiff must demonstrate that: (1) she engaged in protected activity; (2) defendant took an action that a reasonable employee would have found materially adverse; and (3) there exists a causal connection between the protected activity and the adverse action.[75]

Defendant argues summary judgment is appropriate on the retaliation claim because plaintiff has not shown any evidence that defendant took an action that a reasonable employee would have found materially adverse since it did not deny her FMLA claims.  Plaintiff argues that her termination constitutes an adverse action sufficient to establish a *prima facie* case because she was in the process of seeking intermittent leave before her termination.[76]  Defendant responds that there is no factual basis for this claim and that there is no evidence of a causal connection between plaintiff's FMLA requests and her termination.  Defendant points to

---

[71]*McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973); *see also  Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981); *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997).

[72]*See, e.g.*, *Metzler*, 464 F.3d at 1170.

[73]*See id.*

[74]*Id.*

[75]*Id.*; *see also Burlington N. & Santa Fe Ry. Co. v. White*, –U.S.–, 126 S. Ct. 2405, 2415 (2006).

[76]Plaintiff also asserts that she was forced to lose vacation time for FMLA leave.  But she does not indicate when this occurred, or how this was an adverse action.  The FMLA provides that "[a]n eligible employee may elect, or an employer may require the employee, to substitute any of the accrued paid vacation leave, personal leave, or medical or sick leave of the employee . . . for any part of the 12-week period. . . ."  29 U.S.C. § 2612(d)(2)(A).

plaintiff's FMLA request from August 3, 2004, the certifications associated with it, and defendant's approval of the request.  Further, defendant points to evidence that despite this request, it offered plaintiff a position as a correspondence specialist prior to her termination.

Plaintiff does not explain, or point to evidence that would create a genuine issue of material fact about whether plaintiff was terminated because of her August 2004 request for intermittent leave.  This leave request was granted.  Further, plaintiff had remained employed by Blue Cross for seven years, during which time she had filed numerous other requests for leave.  Also, plaintiff was offered an alternate position with the company after she was approved for intermittent FMLA leave.  Plaintiff was only terminated after she declined to accept the correspondence specialist position.  The Court agrees with defendant that plaintiff fails to come forward with evidence to establish a genuine issue of material fact about whether she can meet the third element of a *prima facie* case of FMLA retaliation, a causal connection between her protected activity and the challenged action.

### B.  ADA Claims

### 1.  Discrimination on the Basis of Disability

The ADA prohibits employers from discriminating on the basis of disability.[77]  The elements of a *prima facie* case of ADA discrimination are: (1) plaintiff is a disabled person as defined by the ADA; (2) plaintiff is qualified, with or without reasonable accommodation, to perform the essential functions of the job held or desired; and (3) plaintiff suffered

---

[77]42 U.S.C. § 12112(a) ("No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.").

discrimination by an employer or prospective employer.[78]  The statute defines disability as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."[79]  "Major life activities include such functions as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, sleeping, sitting, standing, lifting, reaching, and working."[80]

Plaintiff maintains that she is disabled under all of the definitions of disability set forth in the statute, however, much of her argumentation appears to center around the causal connection element of the *prima facie* case.  Consequently, the Court attempts to extract her arguments that appear to address the question of whether she is disabled under the statute.

### a.  Actual Disability

Under subsection (A), the Court: (1) considers whether plaintiff's health condition is a physical or mental impairment; (2) identifies the life activity upon which she relies and then determines whether it constitutes a major life activity under the ADA; and (3) asks whether the impairment substantially limits the major life activity.[81]  Plaintiff bears the burden of establishing that she suffers from an impairment that substantially limits a major life activity.[82]  And a

---

[78] *Zwygart v. Bd. of County Comm'rs of Jefferson County, Kan.*, –F.3d–, No. 06-3084, 2007 WL 1196515, at *3 (10th Cir. Apr. 24, 2007); *Bones v. Honeywell, Int'l, Inc.*, 366 F.3d 869, 877–78 (10th Cir. 2004).

[79] 42 U.S.C. § 12102(2).

[80] *Rakity v. Dillon Cos.*, 302 F.3d 1152, 1158 (10th Cir. 2002) (quoting *Doyal v. Oklahoma Heart, Inc.*, 213 F.3d 492, 495–96 (10th Cir. 2000)).

[81] *MacKenzie v. City & County of Denver*, 414 F.3d 1266, 1275 (10th Cir. 2005); *Albert v. Smith's Food & Drug Ctrs, Inc.*, 356 F.3d 1242, 1249 (10th Cir. 2004).

[82] *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 195 (2002).

plaintiff is not disabled under the ADA merely by having an impairment.[83]

Plaintiff does not specifically identify in her response the conditions upon which she claims a physical or mental impairment.  The Court assumes, based on her arguments concerning reasonable accommodation, that she maintains that her hand, arms, back, and neck conditions constitute physical impairments under this analysis.  In support of her contention that she is substantially limited in one or more major life activities,[84] plaintiff argues without further explanation that she was unable to care for herself, had a ten-pound lifting restriction, and that she was unable to work for extended periods of time.  The Court liberally construes these statements as claims that plaintiff's impairments limit her major life activities of caring for herself, lifting, and working.

Plaintiff argues in her response that she is unable to care for herself.  But there is no evidence in the record that plaintiff's impairments rendered her unable to care for herself, not even the admissible portions of her own affidavit.  She had in fact been released from all work restrictions for about two months prior to her termination.  Moreover, a lifting restriction alone or "[m]ere physical exertion (except to the extent it affects one's ability to work) does not constitute a major life activity under the ADA."[85]  Even if it did, defendant has successfully demonstrated a lack of evidence that plaintiff had a ten-pound lifting restriction.  Plaintiff asserts in her deposition that Dr. Moore imposed this restriction in December 2003, but there is no

---

[83]*Id.* at 196.

[84]*See* 29 C.F.R. § 1630.2(I).

[85]*MacKenzie*, 414 F.3d at 1275 (citing 29 C.F.R. § 1630.2(I)); *see also Rakity*, 302 F.3d at 1158 (finding medical records with forty pound lifting restrictions do not establish substantial limitation on life activity of lifting); *Sink v. Wal-Mart Stores, Inc.*, 147 F. Supp. 2d 1085, 1093 (D. Kan. 2001) (rejecting the argument that the inability to lift is a significant restriction in the ability to perform a major life activity) (citing *Reese v. Owens-Corning Fiberglas Corp.*, 31 F. Supp. 2d 908 917–18 (D. Kan. 1998) (collecting cases holding that lifting restriction, without more, is insufficient to demonstrate a substantial limitation on major life activity of lifting or working)).

evidence to support this.  The December 9, 2003 notes by Dr. Moore do not include a lifting restriction of any kind.

Working is considered a major life activity.[86]  Consequently, the Court must determine if plaintiff's physical impairment significantly restricted her ability to perform a major life activity "as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity."[87]  And, since plaintiff asserts that she is restricted in the major life activity of working, there must be evidence that she is significantly restricted

> in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities.  The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working."[88]

The Court must also consider "the geographical area to which the individual has reasonable access, and the 'number and types of jobs utilizing similar training, knowledge, skills or abilities, within the geographical area, from which the individual is also disqualified.'"[89]  No such showing has been made here.  In fact, there is no evidence that plaintiff's doctors imposed any restrictions on the particular job of data capture employee for two months prior to her termination, much less any other category of jobs.[90]

---

[86]*Id.*; *see also Zwygart v. Bd. of County Comm'rs of Jefferson County, Kan.*, –F.3d–, No. 06-3084, 2007 WL 1196515, at *4 (10th Cir. Apr. 24, 2007) (citing *Rakity*, 302 F.3d at 1158).

[87]29 C.F.R. § 1630.2(j)(1)(ii).

[88]*Id.* § 1630.2(j)(3)(I).

[89]*Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 492 (1999) (quoting 29 C.F.R. § 1630.2(j)(3)(ii)(A)).

[90]*Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 199–200 (2002) (comparing appropriate analysis when the major life activity involved is the performance of manual tasks to that when the major life activity is working).  Plaintiff states, without support, that she "was disabled from the classification of clerical work, manual work or was perceived as such by defendant."  Such a conclusory statement will not be considered by the Court.

Plaintiff urges the Court to ignore Dr. Hendler's release from work restriction and focus on restrictions placed on her by other doctors.  But defendant has convincingly pointed to a lack of evidence that any doctor had imposed a work restriction upon plaintiff that was still effective at the time of her termination.  While plaintiff had filled out a request on August 3, 2004 for intermittent FMLA leave in order to accommodate various doctor's appointments, none of the certifications associated with this request referenced her inability to work on a full-time basis.  Nor does plaintiff provide any evidence that would aid the Court in addressing plaintiff's vocational training, or the geographical area to which plaintiff has access.  It is plaintiff's burden to point the Court to evidence that would create a genuine issue of material fact on the matter.  Plaintiff relies only on her own recollections of such restrictions, introduced as hearsay evidence through her affidavit.  This is insufficient to overcome summary judgment.[91]

### b.  Record of Disability

Plaintiff makes the argument that she meets subsection (B) of the definition of disability, because she has a "record of" having a disability within the meaning of subsection (A).[92]  To meet this definition, plaintiff must show that "at some point her impairment actually did substantially limit her ability to work."[93]   To have a record of impairment under this definition, "a plaintiff must have a history of, or have been misclassified as having, an impairment that has

---

Nonetheless, the plaintiff's own claims belie this contention.  Plaintiff contends at multiple points in her brief that she sought out more clerical work that would require less keying and that she felt better working in other departments that did not require so much keying.

[91]Even if plaintiff could point the Court to such restrictions, they would be insufficient because they do not address whether plaintiff would be restricted from performing any job other than a data capture employee.  *See, e.g.*, *Zwygart*, 2007 WL 1196515, at *5; *Rakity*, 302 F.3d at 1161–62; *Selenke v. Med. Imaging of Colo.*, 248 F.3d 1249, 1257 (10th Cir. 2001).

[92]42 U.S.C. § 12102(2)(B).

[93]*McKenzie v. Dovala*, 242 F.3d 967, 972 (10th Cir. 2001).

substantially limited a major life activity."[94]

Plaintiff urges that her long history of back, neck, and upper extremity injuries due to keyboarding support a record of disability under the statute. But this is not supported by the record. As already described, evidence is lacking that her record of problems with her neck, back, and upper extremities rose to the level of substantially limiting the major life activities of taking care of herself, lifting, and working. According to the FMLA paperwork submitted by defendant, although plaintiff missed work intermittently for long periods of time due to her impairments, the only evidence of full-time leave for any significant period of time appears to be when she had her hysterectomy, which was an unrelated health issue for a limited period of time.

The evidence does not point toward a history of a substantial limitation in the major life activity of working. "A history of light duty restrictions does not necessarily demonstrate a record of substantial limitation in working."[95] Defendant has come forward with evidence that Dr. Hendler released plaintiff from all work restrictions in June 2004, finding that there is no therapy or medication that could help her and citing nonphysiologic reasons for her complaints. Finally, as already described, defendant has pointed to a lack of evidence that plaintiff was unable to work in a broad range of jobs during the period of time in question. Plaintiff fails to come forward with evidence that creates a genuine issue of material fact that she has a "record of" substantial limitation in the life activities of taking care of herself, lifting, and working.

---

[94]*Rakity*, 302 F.3d at 1159 (quoting *Sorenson v. Univ. of Utah Hosp.*, 194 F.3d 1084, 1087 (10th Cir. 1999)).

[95]*Id.* (citing *Gutridge v. Clure*, 153 F.3d 898, 901–02 (8th Cir. 1998) (concluding that multiple surgeries and lifting restrictions from carpal tunnel syndrome did not establish triable record of substantial limitation), *cert. denied*, 526 U.S. 1113 (1999)).

### c. Regarded As Disabled

The third definition of disability under the statute applies to individuals who are "regarded as" having a disability within the meaning of subsection (A).[96]   An individual may fall within this definition in two ways: "(1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities."[97]   Under either theory, it must be shown that the employer has "misperceptions about the individual—it must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting."[98]   Plaintiff suggests that she meets this definition based on Moser's deposition testimony that he had concluded she could not perform any work at Blue Cross based on her working restrictions and that he told her to seek employment elsewhere. Plaintiff also cites testimony by plaintiff's other superiors that they were aware of her impairments and that she requested accommodations.

Plaintiff's argument that defendant regarded her impairment as substantially limiting a major life activity is without support in the record.   There is no evidence that defendant believed plaintiff to be unable to take care of herself.   Defendant offered plaintiff the alternate position of correspondence specialist prior to her termination.[99]   Defendant has provided evidence that

---

[96]42 U.S.C.  § 12102(2)(C).

[97]*Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489 (1999).

[98]*Id.*

[99]*See Lucas v. Miami County, Kan.*, 9 Fed. App'x 809, 813 (10th Cir. 2001) (explaining that evidence that employer offered employee another position showed that it did not regard him as precluded from working in an entire class of jobs).  Plaintiff relies on deposition testimony by Moser, only referenced in her argument, that he counseled plaintiff that there may not be any job available at Blue Cross that could meet all of her work restrictions.

Fuller told plaintiff that defendant was prepared to accommodate any work restrictions imposed by her physicians.  Fuller told her that she could alternate keying to accommodate her upper extremity strain.  She assured her that the lifting requirements could also be accommodated, despite the lack of evidence suggesting this restriction was in place at the time of the job offer. The fact that defendant offered this position to plaintiff is strong evidence that it believed her to be qualified for such a position, and thus not substantially limited in the major life activity of working.[100]

Plaintiff provides evidence that various supervisors had knowledge of her impairments. But defendant concedes this point.  Under the "regarded as" definition, plaintiff must go one step further and show that defendant had misperceptions about plaintiff's impairments.  No evidence presented by plaintiff makes such a showing.  And as described above, there is a lack of evidence tending to show that defendant regarded plaintiff's impairments as precluding her from working in an entire class of jobs other than that of a data capture employee.

Because plaintiff has failed to present the Court with evidence suggesting a genuine issue of material fact with regard to whether she has a disability as defined by the ADA, summary judgment is appropriate.

### 2. Retaliation Claim

Under 42 U.S.C. § 12203(b), "[i]t shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having

---

Plaintiff does not point the Court to this testimony with any degree of particularity.  Nor does plaintiff suggest that Moser's comments occurred after her working restrictions were lifted.  The job offer of correspondence specialist prior to plaintiff's termination belies the notion that this sentiment was shared by the decisionmakers, as her termination was a group decision after she declined the alternate position.

[100]*See Nickola v. Storage Tech. Corp.*, 160 Fed. App'x 658, 662 (10th Cir. 2005).

exercised or enjoyed, . . . any right granted or protected by [the ADA]."  In order to establish a

*prima facie* case of retaliation under the ADA, the plaintiff must prove: (1) that she engaged in

activity protected by the statute; (2) that a reasonable employee would have found the challenged

action materially adverse; and (3) that there was a causal connection between the protected

activity and the adverse action.[101]

      Defendant urges that summary judgment is appropriate because plaintiff is unable to

establish that she engaged in protected activity under the ADA.  In response, plaintiff states,

without more, that she "has presented substantial evidence that as a result of her disability she

was mistreated by defendant.  She also presented extensive evidence outlined above of a causal

connection between her disability and her firing by defendant."[102]  But the Court is unable to

locate anywhere in the Pretrial Order or the response brief where plaintiff identifies the protected

activity she was engaged in that prompted the alleged retaliation.  "[P]rotected activity can range

from filing formal charges to complaining informally to supervisors."[103]  Plaintiff did file an

EEOC questionnaire, but not until ten months after her termination.  Based on this protected

activity, plaintiff is unable to assert a claim of retaliation under the ADA.

      A request for accommodation can be a protected activity under the ADA.[104]  But plaintiff

does not make this allegation in either the Pretrial Order or her response brief.  Even if she did,

---

[101]*Haynes v. Level 3 Commc'ns, L.L.C.*, 456 F.3d 1215, 1228 (10th Cir. 2006).  Plaintiff need not be disabled to prosecute a retaliation claim under the ADA.  *Selenke v. Med. Imaging of Colo.*, 248 F.3d 1249, 1264 (10th Cir. 2001).  Instead, she must only show that she had a good faith belief that the statute has been violated.  *Id.*

[102](Doc. 71 at 63.)  At one point, under this section of the response brief, plaintiff refers to the disparate impact theory of relief under the ADA.  At no point has plaintiff alleged such a theory of relief, and the Court disregards this reference.

[103]*Medina v. Income Support Div., N.M.*, 413 F.3d 1131, 1136 (10th Cir. 2005).

[104]*See, e.g.*, *Mondaine v. Am. Drug Stores, Inc.*, 408 F. Supp. 2d 1169, 1191 (D. Kan. 2006).

plaintiff can show no evidence of a causal connection between her request for accommodation and her termination.  Instead, the evidence shows that plaintiff was offered an alternate position and an accommodation that she declined prior to being terminated.  This evidence suggests that defendant responded to plaintiff's request for accommodation, not that it retaliated against her for it.  Because plaintiff fails to come forward with specific facts, supported by admissible evidence, that would lead a reasonable jury to find in her favor, defendant's motion for summary judgment is granted on the ADA retaliation claim.

### C. Workers' Compensation Retaliation Claim

Because the Court grants summary judgment to defendant on the federal claims, it is authorized to decline supplemental jurisdiction over the remaining state law claim of workers' compensation retaliation.[105]  Whether to exercise supplemental jurisdiction is committed to the court's sound discretion.[106]  28 U.S.C. section 1367 "reflects the understanding that, when deciding whether to exercise supplemental jurisdiction, 'a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness and comity.'"[107]  The Court determines that these considerations weigh in favor of exercising jurisdiction over plaintiff's remaining state law claim.  Exercising jurisdiction is in the best interest of judicial economy and convenience given that the facts on all claims asserted in this case are interrelated.

The plaintiff's burden in opposing a motion for summary judgment on her workers'

---

[105]28 U.S.C. § 1367(c)(3).

[106]*City of Chicago  v. Int'l Coll. of Surgeons*, 522 U.S. 156, 172–73 (1997); *see also Anglemyer v. Hamilton County Hosp.*, 58 F.3d 533, 541 (10th Cir. 1995).

[107]*City of Chicago*, 522 U.S. at 173 (quoting *Carnegie-Mellon University v. Cohill*, 484 U.S. 343, 350 (1988)); *see also Gold v. Local 7 United Food & Commercial Workers Union*, 159 F.3d 1307, 1310 (10th Cir. 1998), *overruled on other grounds by Styskal v. Weld County Commr's*, 365 F.3d 855 (10th Cir. 2004).

compensation retaliation claim is to prove she was terminated "based on, because of, motivated by or due to" the defendant's intent to retaliate.[108]  The plaintiff need not prove this retaliatory intent with direct evidence nor establish that it was the only reason behind her discharge.[109]  The plaintiff, however, has the burden of proving her claim by a preponderance of the evidence that is "clear and convincing in nature."[110]  Evidence is "clear" when "certain, unambiguous, and plain to the understanding."[111]  Evidence is "convincing" when "reasonable and persuasive enough to cause the trier of fact to believe it."[112]

Not unlike other employment discrimination cases, retaliatory discharge cases typically rely on circumstantial evidence, not direct evidence, to prove the employer's unlawful intent for discharging an employee.[113]  Consequently, "Kansas appellate courts have adopted the burden-shifting analysis of discrimination and free speech cases for use in workers compensation discharge cases."[114]  To establish a *prima facie* case of retaliation, a plaintiff must show that: (1) she sustained an injury for which she could assert a future claim for benefits or filed a claim for workers' compensation benefits; (2) the employer had knowledge of plaintiff's compensation claim, or the fact that she had sustained a work-related injury for which the plaintiff might file a

---

[108]*Foster v. Allied Signal, Inc.*, 293 F.3d 1187, 1192 (10th Cir. 2002) (internal quotations and citations omitted).

[109]*Id.*

[110]*Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001) (citing *Ortega v. IBP, Inc.*, 874 P.2d 1188 (Kan. 1994)).

[111]*Id.*

[112]*Id.*

[113]*Foster*, 293 F.3d at 1192.

[114]*Gonzalez-Centeno v. N. Cent. Kan. Reg'l Juvenile Det. Facility*, 101 P.3d 1170, 1177 (Kan. 2004) (citing *Rebarchek v. Farmers Co-op. Elevator & Mercantile Ass'n*, 35 P.3d 892, 898–99 (Kan. 2001)).

future claim for benefits; (3) the employer terminated the plaintiff's employment; and (4) a causal connection existed between the protected activity or injury and the termination.[115]  Upon such a showing, the burden shifts to the employer to articulate a legitimate, nonretaliatory reason for terminating the employee.[116]

Once the employer discharges this obligation, the plaintiff must continue with the burden of proving by a preponderance of the evidence that the reasons offered by the employer were merely a pretext for wrongful termination.[117]  To avoid summary judgment, the plaintiff must come forward with "'specific facts establishing a triable issue as to whether the employer's reason for discharge is a mere cover-up or pretext for retaliatory discharge.'"[118]  "Although the presumption of discrimination drops out of the picture once the defendant meets its burden of production, the trier of fact may still consider the evidence establishing the plaintiff's *prima facie* case and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual."[119]  "Temporal proximity is sufficient to establish the causal connection element of a *prima facie* case, but is not sufficient—standing alone—to raise a genuine issue of pretext."[120]

First, plaintiff argues that she can prove her claim through the use of direct evidence of discrimination, so the burden-shifting paradigm is unnecessary.  In support, plaintiff points to

---

[115]*Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004); *Foster*, 293 F.3d at 1193.

[116]*Foster*, 293 F.3d at 1193.

[117]*Id.* at 1194.

[118]*Id.* (quoting *Bracken v. Dixon Indus., Inc.*, 38 P.3d 679, 682 (Kan. 2002)).

[119]*Id.* (quoting *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 143 (2000) (internal quotation and citations omitted)).

[120]*Hysten v. Burlington N. Santa Fe Ry. Co.*, 372 F. Supp. 2d 1246, 1254–55 (D. Kan. 2005) (citing in part *Annett v. Univ. of Kansas*, 371 F.3d 1233, 1241 (10th Cir. 2004)).

what she calls the "smoking gun": an email of March 19, 2004 between Rita Sutcliffe and Fuller, attached to plaintiff's response as Exhibit D.  The email states that Berroth, plaintiff's supervisor, "would like to terminate Denise Coleman's employment.  She's had a Work Comp claim for a long time. . . . Terri and I have no problem with terminating her employment if you concur with the supervisor's recommendation based on Denise's performance when there was no medical restriction otherwise.  What additional information do you need?" As defendant correctly noted, this piece of evidence was never used to dispute defendant's statements of facts.

But even if this evidence had been properly presented to the Court, it does not constitute either direct or circumstantial evidence of a causal connection between plaintiff's workers' compensation claim and her termination.  Direct evidence in an employment discrimination case requires proof of  "an existing policy which itself constitutes discrimination."[121]  But comments that "are merely expressions of personal opinion or bias do not constitute direct evidence of discrimination."[122]  This is because these statements "require the trier of fact to infer that discrimination was a motivating cause of an employment decision, they are at most circumstantial evidence of discriminatory intent."[123]  Likewise, the statement cited in Exhibit D about plaintiff having "had a Work Comp claim for a long time" is at most circumstantial evidence of discriminatory intent because it requires the trier of fact to infer that this statement, within the context of the entire email, translated into a decision in August 2004 to terminate plaintiff because of her workers' compensation claim.

Defendant argues that plaintiff is unable to establish a *prima facie* case of workers'

___

[121]*Tomsic v. State Farm Mut. Auto. Ins. Co.*, 85 F.3d 1472, 1477 (10th Cir. 1996) (citations omitted).

[122]*E.E.O.C. v. Wiltel, Inc.*, 81 F.3d 1508, 1514 (10th Cir. 1996).

[123]*Id.*

compensation retaliation because there is no evidence of a causal connection between her workers' compensation claims and her termination. A causal connection may be demonstrated by evidence such as protected conduct closely followed by adverse action.[124] Unless there is very close temporal proximity between the protected activity and the retaliatory conduct, the plaintiff must offer additional evidence to establish causation.[125] "[W]e have held that a one and one-half month period between protected activity and adverse action may, by itself, establish causation. By contrast, we have held that a three-month period, standing alone, is insufficient to establish causation."[126] Here, over four months passed between the time that the March 19, 2004 email plaintiff relies upon was written and plaintiff's termination. And plaintiff's second workers' compensation claim was filed on November 21, 2002. Since plaintiff's protected activity was not closely followed by adverse action, plaintiff may not rely on temporal proximity alone to establish causation.

Plaintiff again points to the email in Exhibit D as evidence that defendant intended to terminate her because of her workers' compensation claims. But this email only refers to Berroth's desire to terminate plaintiff. As Young testified during his deposition, the decision to terminate plaintiff was a group decision. There is no indication in the email that Berroth's desire to terminate plaintiff was acted upon by anyone else who received the email.[127] Finally, when read in context, the email actually supports a conclusion that plaintiff's supervisor sought to

---

[124]*Conner v. Schnuck Markets, Inc.*, 121 F.3d 1390, 1395 (10th Cir. 1997).

[125]*O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001) (citing *Conner*, 121 F.3d at 343).

[126]*Id.* (citing *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999)).

[127]The Court takes the opportunity to observe that Exhibit D is a chain of emails that is extremely difficult to read in context. It contains a number of forwarded emails and appears to be missing portions of some. For example, the bottom of page 5 does not appear to continue on to the top of page 6, instead, page 6 appears to be a different email.

terminate her because of her performance problems.  There is no "because of" language in the email.  The Court finds plaintiff is unable to come forward with evidence sufficient to establish a causal connection on this claim.

Still, because the Court is cognizant that a "prima facie case is not an onerous burden,"[128] the Court will proceed to evaluate plaintiff's assertion of pretext on this claim.  Defendant has met its burden of coming forward with a legitimate, nondiscriminatory reason for plaintiff's termination; namely, that it terminated plaintiff because she failed to meet objective performance criteria, despite multiple attempts to counsel and warn her that her performance was falling short of established goals.  Plaintiff appears to argue that the March 19, 2004 email, along with the fact that her accuracy level was 100% during her last week working for defendant, establishes evidence of pretext.

To demonstrate pretext, a plaintiff should show more than "mere conjecture" that her employer's reason for termination  is insufficient.[129]  Plaintiff must show that the employer's stated reason for termination "was so inconsistent, implausible, incoherent, or contradictory that it is unworthy of belief."[130]  The Tenth Circuit has held that a plaintiff in federal court who opposes summary judgment in a retaliatory discharge case based on Kansas law must set forth evidence of a clear and convincing nature that, if believed by the ultimate fact finder, would establish that plaintiff was more likely than not the victim of illegal retaliation by her

---

[128]*Rebarchek v. Farmers Co-op Elevator*, 35 P.2d 892 (Kan. 2001).

[129]*Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997).

[130]*Miller v. Auto. Club of New Mexico, Inc.*, 420 F.3d 1098, 1124 (10th Cir. 2005) (quotation omitted).

employer.[131]  Clear and convincing evidence does not require quantity, but requires that the quality of evidence is clear enough to make the trier of fact believe it.[132]

The quality of evidence presented by plaintiff here falls short of establishing pretext by clear and convincing evidence.  In addition to the email, plaintiff argues that defendant placed higher work demands upon her and that she was terminated despite her accuracy being at 100% the week before she was terminated.

First, the email, to the extent the Court can even consider it as summary judgment evidence, does not support plaintiff's pretext argument.  It is undisputed that there were many individuals who agreed as a group to terminate plaintiff, four months after this email was generated.  Further, one of the more recent emails in the chain of emails marked as Exhibit D is from Jane Holt, in-house counsel, suggesting that she needed more information about the situation before she could advise, but suggested that plaintiff's supervisor (Berroth) needed "support in terms of what she should expect from the employee."[133]  Further, the email was not written by someone who had decision-making authority.[134]  When evaluating pretext, the Court looks to the facts as they appeared to the decisionmaker at the time of the decision to terminate.[135]  The author of the email, Sutcliffe, was not a decisionmaker.  There is no evidence that any of the decisionmakers felt that plaintiff should be fired because of her workers'

---

[131]*Foster v. AlliedSignal Inc.*, 293 F.3d 1187, 1194–95 (10th Cir. 2002).  Kansas courts will not apply the clear and convincing standard at the summary judgment stage in an action for retaliation in the state's own courts. *Id.*

[132]*Ortega v. IBP, Inc.*, 874 P.2d 1188, 1198 (Kan. 1994).

[133](Doc. 71, Ex. D at 5 (Email from Jane Holt to Fuller, Sutcliffe, Janda, and Young on March 25, 2004).)

[134]To the extent plaintiff attempts to attribute the email to the sentiments of Berroth, it is inadmissible hearsay.

[135]*E.g.*, *Campbell v. Meredith Corp.*, 260 F. Supp. 2d 1087, 1105–06 (D. Kan. 2003).

46

compensation claim.  As already discussed, the context of the email does not constitute a

"smoking gun," as plaintiff characterizes it.  While it references the fact that plaintiff had filed a

workers' compensation claim, it does not indicate that this was the reason her supervisor wanted

to terminate her.

Additionally, plaintiff offers no evidence other than her own conclusory statements that

she was evaluated at a different rate than other data capture employees.[136]  To the extent that her

performance was evaluated on a weekly basis, it is undisputed that the supervisors received

performance reports on a daily basis.  Plaintiff's unsatisfactory performance reports were issued

based on her weekly numbers.  But plaintiff has failed to point the Court to evidence that she

was singled out in this way.

Plaintiff's argument that she was terminated despite a 100% accuracy rating is

incomplete.  First, it is undisputed that the performance standards that plaintiff struggled to meet

involved both quantity and accuracy.  The primary problem cited on plaintiff's unsatisfactory

work reports involve her quantitative deficiencies.  Instead of processing one claim every 1.65

minutes, plaintiff was taking between 3 and 4 minutes per claim for the weeks ending August 6

and August 13, 2004.  Defendant has come forward with evidence that plaintiff was also told that

for the week ending August 6, 2004, her accuracy rating was 88.24%.  Therefore, even if

plaintiff's accuracy rating was 100% for the week ending August 13, she does not dispute that

her quantitative production failed to meet the performance goal.  Because plaintiff is unable to

come forward with evidence that would allow a reasonable trier of fact to conclude that

defendant's legitimate explanation for her termination was in fact a pretext for workers'

---

[136]While merit increases appear to be based on a monthly evaluation, daily performance reports were sent to the supervisors.  The preprinted forms have a blank for the performance or attendance of the "week ending," suggesting this form was not used solely to evaluate plaintiff.

compensation retaliation, summary judgment is appropriate.

**IT IS THEREFORE ORDERED BY THE COURT** that defendant's Motion for Summary Judgment (Doc. 58) is **granted** on all claims.

**IT IS FURTHER ORDERED BY THE COURT** that defendant's Motion to Strike Plaintiff's Response to Defendant's Motion for Summary Judgment (Doc. 72) is **denied**, and plaintiff's Motion to Amend/Correct Memorandum in Opposition to Motion (Doc. 79) is **denied**.

**IT IS SO ORDERED**.

Dated this <u>16th</u> day of May 2007

      S/   Julie A. Robinson    
      Julie A. Robinson
      United States District Judge

*Coleman v. Blue Cross Blue Shield of Kansas*, Case No. 05-4149, Memorandum and Order